**OHRENSTEIN & BROWN, LLP**
COUNSELORS AT LAW

1305 FRANKLIN AVENUE, SUITE 300, GARDEN CITY, NY 11530-9243 • M 516 873 6334 • F 516 873 8912
WWW.OANDB.COM

MATT BRYANT
Direct Dial: (516) 535-4419
Email: MATTHEW.BRYANT@OANDB.COM

August 4, 2015

**Delivered ECF**
Honorable James L. Cott
United States District Court
Southern District of New York
500 Pearl Street, Room 1640
New York, NY 10007

> Re: In the Matter of the Arbitration Between AmTrust North America, Inc.
> and Technology Insurance Company, Claimants-Petitioners
> v. Pac Re, Inc. and Pac Re 5-AT, Respondents
> Case No.: 14-CV-9494
> Our File No.: 3639-006

To The Honorable Judge Cott:

We represent Plaintiffs and write pursuant to your Individual Practices Rule II(B)(1) for a Rule 37 pre-motion conference.

*Background of The Program and The Arbitration*

This is an alter ego and veil piercing case against a consortium of insurance entities and the individuals that control them. (April 10, 2015 Tr. 4: 13-25, Ex. 1.) Plaintiffs are seeking $7.8M from the non-party captive reinsurer for claim and expense payments in a parallel arbitration. In that matter, the Panel has ordered the captive to initially post $3.9M in security and proffer calculation-objections to the remainder of the necessary collateral by August 25.

These damages arise out of a short-lived general liability insurance and reinsurance program for small construction contractors from October 1, 2010 through May 31, 2012 (the Program) that included: a fronting insurer (non-party United Specialty Insurance Company, the "Front"); the first reinsurer/cedant-reinsured (Plaintiffs); and Pacific Re, Inc. (the non-party protective cell captive reinsurer, "Pac Re"). Defendant Safebuilt held Pac Re out as its wholly-owned captive. Safebuilt, the Program's General Agent subject to a broad hold-harmless clause effectively making it the Program guarantor, was responsible for soliciting, underwriting, binding policies, premium collection, and financial reporting. The Program was modeled after a related construction contractor program through Preferred Contractors Insurance Company Risk Retention Group, LLC ("PCIC") that Safebuilt, Taft, and the Individual Defendants controlled, which they alleged was profitable.



In pertinent part, Plaintiffs reinsured the Front 100% and ceded 100% of the first $250,000 loss per occurrence (and a risk layer above that called the Loss Corridor not pertinent here) to Pac Re, which bore that risk in cell "5-AT". The risks reinsured were to be collateralized in two trust accounts to the level of reserves "expected" by Plaintiffs. While one of the trusts was to be collateralized by Program premium, Plaintiffs had the right to call for additional funding when expected losses exceeded collateral. As the self-declared "Participant" and beneficial owner of Cell 5-AT under the Cell's Participation Agreement, Safebuilt was required to provide this funding.

Within 45 days of each month's closing, Safebuilt was required to report: (i) total written premium, earned and unearned premium, commission paid, and losses incurred, (Gen. Agency Agreements (GAA) ¶ 2.20; 5.04, Ex. 2); and (ii) gross premium, surcharges and taxes, commissions percent and amount, and net premiums and surcharges, (QSA ¶ 6.05(h)-(k), Ex. 3). Safebuilt was required to: (i) provide any other reports necessary for regulatory purposes, (GAA ¶ 6.02, Ex. 2), (ii) maintain adequate accounting procedures to provide statistics for all such reporting requirements, (*id.* ¶ 5.03), and (iii) insure that sub-producers followed these requirements, (*id.* ¶ 4.01).

The Quota Share Agreement allowed Safebuilt to take a commission of approximately 25%, (QSA ¶ 8.05, Ex. 3), as its sole compensation, (Gen. Ag. ¶ 1.05, Ex. 2). Plaintiffs were entitled to "Net Premiums" (gross written premium less brokerage and a provisional TPA allowance) and "Net Policy Fees" (Policy Fees less return fees), (QSA ¶ 8.01, Ex. 3), and the Front was entitled the greater of minimum ceding fees or 5% of the Net Premiums and Net Policy Fees, (*id.* ¶ 8.02).

Safebuilt provided monthly financial reports and held itself out as a paperless, technologically cutting-edge, professional insurance agency and brokerage with a wholly-owned IT firm called Octance. Throughout the Program, Taft provided monthly reports including premiums and commissions. (*See, e.g.,* Sept. 30, 2011 email of M. Goff (attaching USIC July Reports), Ex. 4.) These reports falsely disclosed that no policy fees were collected. (*See, e.g., id.* at *3.) Around October 2011, Plaintiffs audited Safebuilt and discovered that instead of properly charging and remitting Net Premium, Safebuilt was dividing the cost of insurance between approximately 1/3 premium to 2/3 fees, (*see, e.g.,* Oct. 19, 2011 Lasher email (describing fees), Ex. 5), which were not being remitted as required. Plaintiffs' then terminated the Program placing it in run-off effective May 31, 2012. (2d Am. Compl. ¶ 36, Ex. 6) In early 2014, as Plaintiffs calculated run-off collateral and expense payments from Pac Re, PCIC's state regulator (Montana State Commissioner of Securities and Insurance) found that PCIC was underfunded by approximately $12.6M and, as a result, Pac Re was unable to honor its reinsurance obligations. (Am. Exam. of PCIC at 16-17, Ex. 7.)

*This Action and Discovery to Date*

Plaintiffs commenced this Action against the individuals and corporate consortium that refused run-off funding to Pac Re and refused to honor Safebuilt's back-stop funding obligations, (2d Am. Compl. ¶ 27(a), Ex. 6), despite taking millions in compensation, (*id.* ¶ 95), that they had



already disbursed, (*id.* ¶33). Further, Defendants maintained that no recourse was available for Plaintiffs because, beyond a mere $600,000 in cell 5-AT, Pac Re itself had no assets and was owned by a shell, defendant Preferred Global, with no assets. (*Id.* ¶ 53.) Safebuilt likewise now has insufficient assets to provide funding due to the alleged waste and mismanagement. (*Id.*¶ 56.) Plaintiffs brought breach of contract and fiduciary duty claims against Safebuilt; alter ego, veil piercing, conversion, and fraudulent conveyance claims against the individual owners and their related sub-producers (defendants Pike, Salvagio, Savoia, Pike, Inc., and Salmen, Inc.), and a negligence claim against Taft, the captive manager under whose watch the captive was dominated and exposed to unfunded liability.

On April 10, 2015, the Court: (i) denied the defense motion to dismiss, transfer, or stay the Action, (Apr. 10 Tr. at 3:1, Ex. 1); (ii) held the alter ego claims were sufficiently pleaded (*id.* at 5:19-22); (iii) held alter ego discovery in abeyance, (*id.* at 8:7-11); (iii) ordered broad Rule 26 automatic disclosure of all SIS Program files and emails by April 30, 2015 (*id.* at 13:4-11); and (iv) ordered all discovery completed by November 20, (id. at 16:9-11). On June 9, 2015, following Defendants' failure to comply with the Rule 26 Order which necessitated Plaintiffs May 13, 2015 written demands and interrogatories, the Court: (i) declined to extend the discovery schedule; (ii) opened alter ego discovery; (iii) ordered exchanges completed by July 1; (iii) cautioned "should either party engage in delay tactics or otherwise fail to proceed in a professional manner, the Court will not hesitate to impose sanctions. The Court also will entertain motions to preclude for any failure to abide by applicable discovery rules and deadline[,]" (M.E. Jun. 9, 2015), and (iv) referred discovery disputes to this Court, (D.E. No. 74, Jun. 9, 2015).

Prior to and at the June 9 conference, Defendants claimed they had a modest rolling production of 35,000 TIFFs to complete. Defendants did not roll productions. On June 25 they announced that the production: (i) would exceed 200,000 documents and (ii) would not be completed by July 1.

From July 1 through July 8, Defendants produced 165GBs; more than 1M pages if printed. In response to Plaintiffs' 39 document requests, excluding subparts, Defendants superimposed 11 "Issue Codes" and scheduled its production according to its own coding. (Issue Codes and Volume Analysis, Ex. 8.) Issue Codes 8 and 2 correlate to 122GBs (or approximately 191,000 documents) each, and include a veritable mash of native data that could take Plaintiffs months to sort and prepare for depositions after the referring Court declared the November 20 discovery date to be "unmoveable".

*Safebuilt's Interrogatory Responses* (Nos.7-9, 12-15, Ex. 9): Plaintiffs ask Safebuilt to: (i) calculate (by month and distributee) total Program premium, commissions, fees, and other compensation; and (ii) disclose the bank accounts in which it handled Program premium, fees, or other funds. SIS averred that it received commission and Policy Fees but provided no calculations, (SIS Resp. Nos. 7, 8), did not disclose the bank account(s) in which it separated fees or commission from premium funds, (*id.* No. 12-15), and referred Plaintiffs to the 122GB-Issue Code 8 for premium calculations, (*id.* No. 9). On good-faith calls, counsel first reported



that: (i) Safebuilt actually received no commission at all; and next that (ii) if it did keep any commission it "rolled them back" into premium accounts; and (iii) it cannot now calculate any amounts requested but it produced Taft's premium and commission reports somewhere as Issue Code 8.

*Producer-Defendants' Interrogatories* (Producer Resp. Nos. 10, 12, Ex. 10): Plaintiffs ask the Producer-Defendants to calculate monthly compensation derived from PCIC and the Program. They admit receiving commission from each but provide no calculations, and through counsel profess they are unable to do so.

*Individual-Defendant Interrogatories* (Indv. Resp. Nos. 3, 5, 7, 10, Ex. 11): Plaintiffs ask the Individual Defendants to provide compensation calculations from the Program, Pac Re, and PCIC. They aver they received no such income. In conferencing counsel admits that they did receive income but they object to disclosing the amounts because it is an intrusion.

*Interrogatories Identifying All Pac Re Cell Reinsureds* (Indv. Resp. No. 16, Ex. 11; PGH Resp. No. 16, Ex. 12): Plaintiffs ask the Individual-Defendants and Preferred Global to identify the reinsureds of 5-AT and each Pac Re cell. The Individual-Defendants refer to the 5-AT Participation Agreement and Captive Reinsurance Agreement and Preferred Global refuses to answer on the basis of confidentiality.

### *Judicial Intervention and Sanctions Are Warranted*

The aggregate amounts needed to protect Plaintiffs and pay Program claims and expenses will be determined in the Arbitration. This Action, to enforce indemnification provisions and impose alter ego liability, by definition, is about circumventing the corporate immunity that currently shrouds the missing Program funds and the individuals who denuded Pac Re and Safebuilt of these assets. According to Plaintiffs' records, Safebuilt reported $9.2M premium to the Program but reported no policy fees. Plaintiffs have no records to calculate Defendants' total take and Safebuilt may not rely on the defective Taft reports. Plaintiffs' financial discovery is focused on three basic questions: (1) how much Program money was actually collected in premium, fees, and commissions; (2) when was it collected; and (3) where did it go?

Admittedly, this is a difficult and intrusive case for the Defendants. Yet the Defense could avoid these intrusive claims by waiving objections and simply posting the full security requested in the Arbitration pursuant to Insurance Law §1213(c). Instead, Defendants have burdened Plaintiffs with the role of bloodhound while they hide their tracks in black-pepper to run out the clock. Defendants intend to stall and force an alter ego trial with incomplete discovery, in which Plaintiffs by necessity must rely on Defendants' records, to walk away from any Arbitration award without personal liability.

When one compares Judge McMahon's June 9 Minute Entry to ensuing discovery sanctions are warranted. The Defendants never reported policy fees (which we estimate may reach $18M) and Safebuilt must tally them now. Taft did report approximately $2.3 million of Safebuilt's commissions (which in a fiduciary duty case are subject to disgorgement) and premium; but it may not now hide its books in a 122GB pile. Safebuilt cannot avoid disclosure

4



with equivocation: if it did not keep any commissions and passed them to sub-producers, it is effectively admitting fraudulent conveyance and must disclose the amounts and distributees; if it "rolled them" into the premium account it is effectively admitting that it illegally commingled personal funds in a premium account to hide them. Safebuilt and the Producer-Defendants must now make a Hobson's choice: they either commingled or fraudulently conveyed commissions or must change their answer yet again and betray discovery gamesmanship. Either way they must provide transparent financial disclosure.

The Individual-Defendants initially verified that they received no income from any relevant source and that they have no ordinary coarse earnings rewards to produce. (Def. R. 34 Resp. No 6, Ex. 12.) They now admit that is false but refuse to answer based on "intrusiveness" and posit that Plaintiffs have no right to full disclosure of their entire earnings. Judge McMahon previously sustained the alter ego claims as well-pleaded and opened discovery on the topic. Defendants ignore her at their peril.

Finally, the identity of the direct reinsured of Cell 5-AT should not be in dispute: it is Plaintiffs. Plaintiffs maintain that as a result of this undisputed fact, the 5-AT was established in violation of Montana Statute, which requires the reinsured to be the "Participant". MT Code Ann. §§ 33-28-101(24), (25) (defining "Participant" and "Participant Contract" as the cell's insured). There is no reasonable dispute to this fact, which establishes that Defendants abused the Program's corporate form at inception by secretly identifying Safebuilt as the Participant. This was not revealed to Plaintiffs until litigation. Defendants attempt to avoid this admission by relying on documents that do not answer the question and, if taken at face value, would provide contradictory answers; hence the need for the interrogatory. Likewise, the So-Ordered Protective Order renders Preferred Global's objection to identifying the other cells, which may reveal sources of attachable funds, improper. (D.E. 50, May 5, 2015.)

Sanctions and preclusion are warranted.

I certify that: (1) this office held good-faith conference calls on July 17, 2015 at 11:00 a.m.; July 28, 2015 at 4:00 p.m.; July 30, 2015 at 4 p.m.; (2) the calls' durations were, approximately, two hours, one hour, and two hours, respectively; (3) I was present with Mr. Schurkman for Plaintiffs (Mr. Brown joined us on July 30); Messrs. Berger and Bender joined for Defendants; (4) Defendants' position on the specific issues being raised are presented above; (5) Plaintiffs declared an impasse by telephone on July 30, 2015, and gave Defendants 24 hours provide the information. Defendants responded on July 31 but maintained the position above. On August 4, I telephoned Mr. Bender to stand on the July 30 impasse and confirm our intent to seek judicial intervention.

Respectfully submitted,

Matt Bryant, Esq.

cc:   **ECF All Parties of Record**
      **courtesy copy to Chambers via Fed Ex**